FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 3 0 2004

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

at ___ o'clock and 05 min. P.M.
WALTER A.Y.H. CHINN, CLERK

DANIEL P. RYAN and CALIBER       )      CIVIL NO. 04-00561 HG-KSC
PROMOTIONS, INC. dba CALIBER     )
GROUP; SLASH-IT SALES EVENT,     )
INC.; and JN GROUP, INC.,        )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )
TONY HAWAII AUTOMOTIVE GROUP,    )
LTD. dba TONY GROUP AUTOPLEX;    )
TONY HAWAII CORP. dba TONY       )
HONDA; TONY MOTORS, INC. dba     )
TONY VOLKSWAGEN; and PACIFIC     )
NISSAN, INC. dba TONY NISSAN,    )
                                 )
          Defendants.            )
_____)


**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

The present case involves an automobile sales technique.

Plaintiffs call their version of the sales method "Slash-It"

sales, while Defendants refer to their version as "Slasher"

sales.  Plaintiffs claim they have trademark protection for the

name "Slash-It" sale and trade dress rights in the specific

aspects of the sales events, and that Defendants are infringing

on their trademark and trade dress.  On September 17, 2004 the

Court granted a temporary restraining order prohibiting

Defendants from using the marks "Slasher" or "Slash-It" in their

39

sales events or advertisements.

Plaintiffs move for a preliminary injunction enjoining Defendants from using the term "Slasher" sale, or conducting such sales. To succeed on their trademark claim plaintiffs must show a valid trademark and its infringement. For their trade dress claims, they must demonstrate that their marketing method meets the definition of trade dress under the law and is entitled to protection. For the reasons set forth below, the court GRANTS IN PART AND DENIES IN PART Plaintiffs' Motion for Preliminary Injunction. The preliminary injunction is granted with respect to Plaintiffs' trademark infringement claim and Defendants are enjoined from using either the "Slasher" or "Slash-It" marks. The preliminary injunction is denied with respect to the trademark dilution, trade dress infringement, and state law trademark dilution and trade dress claims.

## SUMMARY OF FACTS

Plaintiff Daniel P. Ryan is a California resident. Ryan uses a persona called "Madman Dan" when conducting the sales. He owns Plaintiff corporations Caliber Promotions, Inc. and Slash-It Sales Event, Inc. Ryan claims to have developed a unique sales method for marketing used automobiles. On March 2, 1999 Ryan registered the mark "Slash-It! Sales Event" in the Principle Register of the United States Trademark Office. U.S. Trademark Reg. No. 2,227,377. (Exh. B to Pl.'s Mot. for Prelim. Inj.

(Certificate of Registration).)

Ryan's sales method involves holding "Slash-It" sales events on weekends. The events are advertised in advance through print advertisements that have "Slash-It" printed in bold letters, promise cars for under $100 and "on the spot delivery." The ads also detail the procedure followed during "Slash-It" sales events.

By Plaintiffs' account, at the "Slash-It" events, customers are given time before the event to inspect the cars offered for sale. The cars have prices written on the windshields. Immediately before the price-cutting begins, the customers convene under a tent. At a certain time, they are instructed to walk to the car they wish to purchase. To signify he wishes to purchase a car, a customer is told to sit behind the wheel and honk the horn. Upon a horn's honking, "Madman Dan" (Plaintiff Ryan's alter-ego) comes to the car and "slashes" the price by crossing off the price on the windshield and writing a lower price in its place. The "Slash-It" events also include food at "rock bottom" prices, upbeat music, a uniformed security guard, and salespeople with clipboards. (Stanford Decl. 9/14/04.)

Plaintiff JN Group is a Hawaii automobile dealership. The Ryan Plaintiffs licensed the JN Group as their exclusive licensee for "Slash-It" sales events in the State of Hawaii. Plaintiff JN Group claims to have held 90 consecutive monthly "Slash-It"

3

events as of August 2004, and Ryan declares that he has come to Honolulu to personally conduct each sale. (Ryan Decl. 9/14/04 ¶ 9) This would mean their first "Slash-It" sale was conducted in February 1997. Since 1997, JN Group alleges it has spent over $5 million advertising "Slash-It" events in Honolulu through newspapers, radio, and television. (Stanford Decl. 9/14/04 ¶ 4.)

Plaintiffs claim that around February 2004 Defendants, a group of auto dealerships known collectively as the Tony Group, began conducting sales events advertised as "The Original Slasher Sale" that were identical in most aspects to Plaintiffs' sales events. According to Plaintiffs, Defendants copied their horn-honking and price-slashing procedure, with Steve Wolshin (a/k/a "Duke") acting as the emcee and presiding over the slashing of prices on the car windshields. Steve Wolshin, once a defendant in this case, was dismissed as a party on September 17, 2004. In February 2004, the Tony Group hired him as an independent contractor for one year to conduct various "slasher" sales. Defendants did not respond to a cease and desist letter dated August 11, 2004. (Ryan Decl. Ex. E.) Plaintiffs then filed the present action on September 14, 2004.

On September 17, 2004, the matter came on for hearing. At the hearing, the court granted Plaintiffs' request for a temporary restraining order prohibiting Defendants from using the service marks "Slash-It" or "Slasher."

4

Prior to the hearing on October 13, 2004 on Plaintiffs' request for a preliminary injunction, Defendants provided new evidence of other uses of both the term "Slasher" and Plaintiffs' sales technique.  Defendants provide proof that Steve Wolshin has been conducting "Slasher" sales in Hawaii beginning in May 1997. Wolshin contends that his business associate Rhonda Borntrager first registered the service mark "Slasher Sale" with the State of Hawaii in May 1997.  (Wolshin Decl. filed on 10/7/04 ¶ 3; Exh. A.)  Wolshin claims to have presided over "Slasher" sales events in Hawaii for several different automobile dealerships on a multitude of occasions since 1997.  (Id. at ¶ 2.)  Wolshin states he began his use of "Slasher" without any knowledge that it had been used elsewhere.  (Id. at ¶ 20.)

Defendants also presented evidence that a third auto dealer, Pflueger Honda, has been conducting sales events in Hawaii with the same purported trade dress Plaintiffs seek to protect.  (Id. ¶ 21; Nascimento Test. 10/13/04.)  Pflueger Honda has held these sales at various times since 2000.  (Id.)

At the preliminary injunction hearing, Defendants presented evidence of "Slasher" sale activity on the Mainland.  Defendants introduced a seven-minute video from the DVD of the feature length documentary "Slasher."  The documentary contained footage of at least one other auto dealership holding "slasher" sales similar to those held by the parties.  Defendants' evidence was

5

inconclusive as to the date made, the actual distribution of the film, and the area in which the "Slasher" sales depicted occurred.  There was no doubt, however, that they depicted an individual who traveled about the Mainland conducting "Slasher" sales for auto dealers.

The issue before the court is whether a preliminary injunction should be granted on Plaintiffs' trademark, trade dress, and state law claims.

## PROCEDURAL HISTORY

On September 14, 2004, Plaintiffs filed a complaint, an Application for a Temporary Restraining Order, and a Motion for a Preliminary Injunction.

On September 16, 2004, Defendants filed their Memorandum in Opposition and the declaration of Lori Nascimento.  Plaintiffs filed the supplemental declaration of Howard Glickstein.

On September 17, 2004, Defendants filed the declaration of Lori Nascimento.  Plaintiffs filed the supplemental declarations of Daniel Ryan and Ken Stanford.

Also on September 17, 2004 the court heard the application for a Temporary Restraining Order.  The court granted the request in part and denied it in part, prohibiting Defendants from using the terms "Slasher" or "Slash-It" in relation to their sales events.  The court also granted Plaintiffs' motion to dismiss Steve Wolshin without prejudice.

6

On September 20, 2004 Defendants filed the supplemental declaration of Robert Ramirez.

On September 24, 2004, Plaintiffs filed a supplemental brief on the trade dress issue.

On September 24, 2004 the court issued its written order granting the application for a temporary restraining order in part and denying it in part.  The court restrained Defendants from using the terms "Slasher" or "Slash-It" in relation to their sales events.

On October 1, 2004, Defendants filed their Responsive Brief and declarations of Rhonda Borntrager and Lori Nascimento.

On October 5, 2004, Defendants filed a supplemental declaration of Rhonda Borntrager.

On October 6, 2004, Plaintiffs filed their Reply Brief.

On October 7, 2004, Defendants filed the supplemental declaration of Steve Wolshin.

The motion for preliminary injunction was heard on October 13, 2004.  The court heard the testimony of Ken Stanford for Plaintiffs and the testimony of Lori Nascimento for Defendants. Defendants also showed a seven-minute video depicting an individual who conducted other "slasher" sales on the Mainland.

Subsequent to the October 13, 2004 hearing, the parties filed additional declarations.  The court did not consider the late-filed declarations in deciding the motion for the

preliminary injunction.

## STANDARD OF REVIEW

Courts consider two factors in determining whether to grant a preliminary injunction: (1) the claim's likelihood of success on the merits; and (2) the relative balance of potential hardships to the plaintiffs, defendants, and the public. Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001) (citation omitted); State of Alaska v. Native Village of Venetie, 856 F.2d 1384, 1388 (9th Cir. 1988). These two factors have been incorporated into a test under which the moving party may meet its burden by demonstrating either: (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. American Tunaboat Ass'n v. Brown, 67 F.3d 1404, 1411 (9th Cir. 1995). These formulations are not different tests, but represent two points on a sliding scale in which the degree of irreparable harm must increase as the probability of success on the merits decreases. Save Our Sonoran, Inc. v. Flowers, 381 F.3d 905, 912 (9th Cir. 2004); Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987).

## ANALYSIS

### I.  TRADEMARK INFRINGEMENT

Plaintiffs claim that Defendants' use of the term "Slasher"

to describe their car sales events infringes upon their trademark. Plaintiffs use their "Slash-It" trademark to identify similar automobile sales.

To establish a case of trademark infringement under the Lanham Act, the plaintiff must prove 1) the validity of the mark, and 2) that the defendant's mark creates a likelihood of confusion. Comedy III Prod., Inc. v. New Line Cinema, 200 F.3d 593, 594 (9th Cir. 2000)(citing J. Thomas McCarthy, McCarthy on Trademarks § 15.1 (4th ed. 1998)). Validity of the trademark is a threshold issue as an invalid trademark cannot be infringed. Tie Tech, Inc. v. Kinedyne, Corp., 296 F.3d 778, 783 (9th Cir. 2002). The court finds that Plaintiffs have established a likelihood of succeeding on their trademark claim.

## A.   **Validity**

A plaintiff establishes validity by showing that the public recognizes its trademark as identifying particular goods or services and distinguishing their product from others. Comedy III, 200 F.3d at 595. To do this, the plaintiff can show either that the mark is inherently distinctive, or that it has acquired a secondary meaning. Id. A certificate of registration of a mark is prima facie evidence of its validity, of the registrant's ownership of the mark, and the registrant's exclusive right to use the registered mark in commerce in connection with the goods or services specified in the certificate. 15 U.S.C. §§ 1057(b),

9

1115(a).  The presumption can be rebutted.  <u>Tie Tech</u>, 296 F.3d at 784.  If the registrant has continuously used the mark in commerce after registration for five years, its right to use the mark is "incontestable," with limited, narrow statutory exceptions.  15 U.S.C. § 1065.

The presumption of trademark validity, due to registration, dates from the filing date of the application for registration. <u>Sengoku Works, Ltd. v. RMC Int'l, Ltd.</u>, 96 F.3d 1217, 1219 (9th Cir. 1996).  If a non-registrant is able to show it used the mark in commerce first, the registration may be invalidated.  <u>Id</u>. at 1220.  A defendant's continuous prior use of the mark before a plaintiff's registration is a defense to a charge of infringement.  15 U.S.C. § 1115(b)(5).  The defendant's use must be both prior and continuous.  <u>Id</u>.  The defense applies only to the geographic area of the defendant's prior use of the mark. <u>Id</u>.

**1. Prior Use and its Effect on the Registration of the Mark**

In the present case, if Defendants are able to show that Steve Wolshin was the prior user of the disputed "Slasher" trademark in Hawaii, there may be no infringement and injunctive relief may not be proper.

The prior use of a registered trademark in commerce by someone other than the registrant normally rebuts the statutory presumption that the registrant has the exclusive right to use

the mark.  To be a prior user, a person must have used the mark
prior to the date of the filing of the registration application.
15 U.S.C. § 1115(b)(5).  The date of filing of the registration
application is referred to as the date of the registrant's
constructive use of the mark.  The registrant does not get a
statutory presumption of priority of use over people who have
used the mark prior the registrant's filing.  15 U.S.C. §
1057(c).

In <u>Mister Donut of America, Inc. v. Mr. Donut, Inc.</u>, 418
F.2d 838, 841 (9th Cir. 1969) the plaintiff Mister Donut
registered the trademark "Mister Donut" in 1958.  A year earlier,
the defendant had opened a store called "Mr. Donut" in Orange
County.  <u>Id</u>. at 841.  Defendant Mr. Donut later opened several
more shops in Orange County.  The court held that the defendant's
prior use of the mark Mr. Donut at its original Orange County
shop was a complete defense to infringement as far as that
particular location was concerned.  <u>Id</u>. at 843.  The exact
geographic area in which the § 1115(b)(5) defense applied was a
question to be determined by the trial court on remand.  <u>Id</u>. at
844.  <u>See also Spartan Food Sys., Inc. v. HFS Corp.</u>, 813 F.2d
1279, 1281-82 (4th Cir. 1987); <u>Burger King of Florida, Inc. v.
Hoots</u>, 403 F.2d 904, 906-07 (7th Cir. 1968).

The evidence that Wolshin used the mark prior to Plaintiffs'
filing of the trademark registration application is substantial.

11

Defendants have presented evidence, in the form of declarations, from their independent contractor Steve Wolshin and his associate Rhonda Borntrager.  The allegation is that Wolshin conducted "Slasher" car sale events using the mark "Slasher" before Plaintiffs' application for federal trademark registration of the mark "Slash-It."  Steve Wolshin claims to have begun using the term "Slasher Sale" in May, 1997.  Defendants also present evidence that Wolshin registered the service mark "Slasher Sale" with the State of Hawaii in May, 1997.  Between 1997 and 2004 Wolshin claims to have conducted over ten automobile marketing events using the mark "Slasher Sale."  Most of the sales were conducted before 1999, and he does not purport to have conducted any sales between late 1999 and early 2004.

Plaintiffs claim to have held their first sale in Hawaii using the "Slash-It" mark in February 1997.  Wolshin claims to have first used his mark in May 1997.  Plaintiffs registered their mark two years after Wolshin's first alleged use of the mark.  According to the Certificate of Registration Plaintiffs have submitted, the "Slash-It" mark was registered on March 2, 1999.  There is no evidence that Ryan applied for registration significantly before March 2, 1999.  Even if Plaintiffs' first "Slash-It" sale was conducted before Wolshin conducted his first "Slasher" sale, the evidence suggests that Wolshin is a prior user of the mark for the purpose of rebutting the statutory

presumption of validity due to registration because his use came before Plaintiffs' constructive use of the mark.[1]  Plaintiffs' constructive use of the mark began with the filing date of their application for registration.

### 2. Continuity of Use of Mark

Although Wolshin's use of the mark might qualify as "prior use" able to rebut the statutory presumption of validity, Defendants' prior use defense is likely to fail for other reasons.  A prior use defense is negated if Steve Wolshin's use of the "Slasher" trademark was not continuous within the meaning of § 1115(b)(5).  Wolshin's declaration details his history of conducting "Slasher" sales events, but Defendants have not produced evidence of him conducting any such events between late 1999 and early 2004.  Counsel for Defendants stated at the preliminary injunction hearing that Wolshin may not have used the mark during that time.

An interruption in the use of a mark is significant.  In Casual Corner Assoc., Inc. v. Casual Stores of Nevada, Inc., 493

---

[1]  The Court notes that the evidence suggests that Plaintiffs were actually the first users of the "Slash-It" mark in Hawaii because their first use came in February 1997 as opposed to Wolshin's first use in May 1997.  This might give Plaintiffs common law trademark rights which would allow them to protect their mark against Defendants' use.  3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19.3 (4th ed. 2004).  Because the Court finds that the statutory presumption of validity applies due to Wolshin's non-continuous use of the mark, there is no need to determine the extent of Plaintiffs' common law rights in the mark.

13

F.2d 709, 711 (9th Cir. 1974), the defendants and their predecessors had operated clothing stores under the trademark "Casual Corner" over a period of approximately twenty years.  For a period of one year, defendants operated no stores using the trademark.  Id.  They then opened another store using the name Casual Corner.  Id.  Plaintiff had also operated clothing stores using the trademark "Casual Corner" and had properly registered the mark after defendants had been using it.  The defendants argued that their prior use of the mark precluded plaintiff's infringement suit.  Id. at 712.  The trial court ruled for the plaintiff, finding that because the defendants did not use the mark for one year, its use was not continuous.  Id.  Applying a clearly erroneous standard, the Ninth Circuit Court of Appeals affirmed the trial court, holding that "to be a continuing use, the use must be maintained without interruption."  Id. at 712.

Wolshin's declaration of October 7, 2004, submitted to this court on behalf of Defendants, detailing his use of the term "Slasher" sale, contains a four-year hiatus in his use of the "Slasher" mark.  Based on the evidence presented to the court, Plaintiffs are likely to defeat a defense relying on Wolshin's prior continuous use of the mark.  Even if Wolshin had used "Slasher" before Plaintiffs applied for trademark registration for "Slash-It," the prior use defense requires Wolshin's use to have been continuous.  Because they are likely to succeed in

14

disproving the prior use defense, Plaintiffs are likely to succeed on the issue of validity.  Their registration of the mark is prima facie evidence of its validity and Plaintiffs' exclusive rights to use it.

**B.**   **Likelihood of Confusion**

In addition to showing the validity of the mark, in order to prove infringement Plaintiffs must show that Defendants' use of "Slasher" creates the likelihood of consumer confusion with "Slash-It."

The United States Court of Appeals for the Ninth Circuit has articulated the following factors for consideration in determining whether a likelihood of confusion exists: (1) the similarity of the marks; (2) the relatedness of the two companies' services (or products); (3) the marketing channel used; (4) the strength of the registered mark; (5) evidence of actual confusion; and (6) the junior user's intent in adopting its mark; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers. GoTo.com, Inc. v. Walt Disney Company, 202 F.3d 1199, 1205 (9th Cir. 2000).  It is not necessary that all of the factors be established.  See Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1219 (9th Cir. 1987) (finding that the absence of evidence of the defendant's intent is not determinative).

The Plaintiffs have shown that at least six of the eight

15

GoTo.com factors will probably weigh in their favor.

### Factors 1, 2, and 3

When considering the first three factors, the court notes that the marks themselves are clearly very similar. "Slash-It" and "Slasher" are nearly identical terms. Second, the two services being provided, the marketing and selling of cars through a festive, price-slashing sales event, are substantially similar. Third, the marketing channels are largely the same: print, television, and radio ads. The first three factors are the most important, and they all weigh in favor of Plaintiffs. GoTo.com. 203 F.3d at 1205.

### Factor 4

The fourth GoTo.com factor, the strength of a mark, is a function of its conceptual strength and its commercial strength. GoTo.com, 202 F.3d at 1207. Conceptually, on the spectrum of weakest to strongest marks, they progress from generic, to descriptive, suggestive, arbitrary, and ultimately fanciful. Id. Defendant claims that "Slash-It" is a generic mark and therefore cannot be protected. Generic marks are those that identify the product-type itself. Interstellar Starship Serv., Ltd. v. Epix, Inc., 304 F.3d 936, 943 n.6 (9th Cir. 2002). Marks like "aspirin," "cola," "trampoline," "yo-yo," and "yellow pages" are generic and unprotectable. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 12.18 (4th Ed. 2004). The

marks "Slash-It" or "Slasher" are not synonymous with used car sales.  It is not a generic mark.

What is the likelihood that Plaintiffs will be able to show their mark is suggestive rather than merely descriptive?  The distinction is important because descriptive marks receive far less protection than suggestive marks.  Courts protect descriptive marks only if the owner of the mark can show secondary meaning.  <u>Japan Telecom, Inc. v. Japan Telecom Am., Inc.</u>, 287 F.3d 866, 873 (9th Cir. 2002).

The Ninth Circuit Court of Appeals has applied the "degree of imagination" test to determine whether a mark is descriptive or suggestive.  <u>Self-Realization Fellowship Church v. Ananda Church of Self-Realization</u>, 59 F.3d 902, 911 (9th Cir. 1995).  If the mental leap between the trademark and the product is not instantaneous, it implies suggestiveness and not descriptiveness.  <u>Id</u>.  The "Slash-It" mark is at least suggestive.  Hearing the term "Slash-It" does not immediately conjure up the image of a used car sale.  A bit of imagination is required to make the jump from the phrase "Slash-It" to a used car sale.  <u>See</u> <u>e.g.</u> <u>Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.</u>, 841 F. Supp. 1339, 1347-48 (E.D.N.Y. 1994).

**Factor 5**

Turning to the fifth factor in the evaluation of other likelihood of confusion factors, it appears there is some

evidence of actual confusion.  One of Plaintiffs' managers testified at the preliminary injunction hearing that Plaintiffs have received a large number of phone calls and other inquiries indicating consumer confusion between their sales events and those of Defendants.  (Stanford Test. of 10/13/04.)

### Factor 6

The evidence is inconclusive as to Defendants' intent in adopting the mark, the sixth GoTo.com factor.  There is evidence for and against the allegation that Wolshin and JN intended to cause confusion and capitalize on Plaintiffs' goodwill with the use of the "Slasher" mark.  The testimony at the preliminary injunction hearing of Lori Nascimento, a public relations employee for the Tony Group, could be construed to indicate that Defendants noticed the success of Plaintiffs' "Slash-It" sales and decided to hold similar "Slasher" sales.  (Nascimento Test. 10/13/04)  In contrast, Wolshin's declaration stated that he has used the term "Slasher" sale since 1997 and was unaware of anyone else doing it for years afterward.  (Wolshin Decl. ¶ 20)

### Factor 7

The seventh factor, expansion into other markets, is only relevant where parties are not already competing.  The issue is one of possible expansion of the use of the mark into another party's market.  GoTo.com, 203 F.3d at 1209.  This factor is not relevant in the present case because the parties are competitors

18

in the same market.

**Factor 8**

The eighth GoTo.com factor, the degree of care likely to be exercised by consumers, favors Plaintiffs.  There is a question of how much care consumers will exercise in determining which price-slashing sale event to attend.  Customers typically exercise care in choosing a car, but Plaintiffs would have the court construe the product in question as the sales event and not the sale of automobiles themselves.  Courts also look to the price of the product as a factor in determining the degree of care customers will exercise in selecting a product.  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 709 (3rd Cir. 2004).  Even if the cars themselves are the product at issue, consumers in the market for cut-rate cars are less likely to exercise the same amount of care as consumers purchasing luxury cars.

Application of the GoTo.com factors to the facts produced suggest that Defendants have created a likelihood of confusion by using the "Slasher" mark.  Six of the eight factors weigh in Plaintiffs' favor.  The two that do not support Plaintiffs' case are either inconclusive (the intent factor), or irrelevant (the likelihood of expansion into other markets).

## C.  **Balance of Hardships**

Plaintiffs have demonstrated they have a significant likelihood of success in showing that they have a valid mark in

19

"Slash-It."  They have made a strong showing that Defendants are likely to cause confusion in branding their identical service with the "Slasher" mark.  Plaintiffs will suffer harm if the reported consumer confusion continues.  Defendants' use of "Slasher" will capitalize on the goodwill Plaintiffs have built through millions of dollars spent advertising the "Slash-It" mark.  Defendants could funnel business from Plaintiffs to themselves.  The Court grants Plaintiffs' motion to preliminarily enjoin Defendants from using the "Slasher" or "Slash-It" mark.

## II.  TRADEMARK DILUTION

Plaintiffs also claim Defendants' use of "Slasher" dilutes the value of their trademark in "Slash-It."  Injunctive relief is available under the Federal Trademark Dilution Act if a plaintiff can establish that (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use presents a likelihood of dilution of the distinctive value of the mark.  15 U.S.C. § 1125(c).

To meet the "famousness" element of protection under the dilution statutes, "a mark [must] be truly prominent and renowned." Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 875 (9th Cir. 1999) (citation and quotation marks omitted).  The class of marks capable of dilution are only those with "such

20

powerful consumer associations that even non-competing uses can impinge on their value." <u>Id</u>.  Some examples of famous marks are "Nissan," <u>Nissan Motor Co. v. Nissan Computer Corp.</u>, 378 F.3d 1002, 1013 (9th Cir. 2004), "Tiffany," "Coca-Cola," and "Polaroid." 4 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>, § 24.109 (4th Ed. 2004).

Although Plaintiffs have established that they have expended a great amount of funds creating public awareness of their service mark, evidence of extensive advertising and consumer awareness is not sufficient to meet the famousness requirement. <u>Avery</u>, 189 F.3d at 878-79 (evidence of extensive advertising and sales, international operations, and consumer awareness did not establish fame).  To succeed on the trademark dilution claim, Plaintiffs must show that their "Slash-It" trademark is sufficiently famous.  Plaintiffs have not shown that they are likely to succeed in showing their mark is famous.  Plaintiffs' injunctive request must be denied with respect to their trademark dilution claim.


### III.  TRADE DRESS INFRINGEMENT

To succeed on their trade dress claim, Plaintiffs must show 1) that their marketing or sales technique is tangible enough to meet the definition of trade dress under the law; and 2) that the alleged infringement of their trade dress is actionable.

Plaintiffs have not shown a likelihood of success in showing that their trade dress is protected.  Specifically, they have not established a likelihood of success in showing that their trade dress meets the functionality or distinctiveness requirements for the trade dress to be protectable.

Plaintiffs take the position that the aspects of their "Slash-It" car sales service, when taken together, warrant trade dress protection.  The major aspects that Plaintiffs look to in order to create their trade dress are:

(1) used cars advertised for less than $100 through flashy television, radio, and print ads;

(2) sales events beginning under tents;

(3) held on weekends;

(4) consumers inspect cars before the sales events start;

(5) customers walk to cars they want when sale begins;

(6) cars have initial price written on windshield;

(7) customers sit in the driver seat and honk the horns of cars they wish to purchase;

(8) after a car's horn is honked, the emcee, either "Madman Dan" himself or the "Master Slasher," "slashes" the initial price on the windshield with a pen and writes a new one in its place;

(9) delivery is on-the-spot;

(10) music and inexpensive food are provided;

(11) there is a uniformed security person; and

22

(12) salesmen have clipboards.

The parties do not dispute that Defendants' sales events are almost identical to those of Plaintiffs', and that they use most, if not all, of the features listed above.

### Standards

The Lanham Act protects the trade dress of a product or service from infringement.  15 U.S.C. § 1125(a).  "Trade dress is the total image of the business."  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 764 n.1 (1992).  It may include "features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques."  Id.

Mere marketing or advertising ideas are not protected under trade dress law.  Prufrock, Ltd., Inc. v. Lasater, 781 F.2d 129, 131-32 (8th Cir. 1986) ("A franchisor does not have a business interest capable of protection in the mere method and style of doing business."); Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 868 (8th Cir. 1994).  Although trade dress does not include an idea by itself, a business may protect the specific embodiment of a new marketing idea or concept.  1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 8.6 (4th Ed. 2004); Sports Traveler, Inc. v. Advance Magazine Publishers, Inc., 25 F. Supp. 2d 154, 163 (S.D.N.Y. 1998) (refusing protection for claimed trade dress because it relied on the uniqueness of an idea itself not the specific embodiment of an

23

idea).

Three elements are required to state a successful trade dress infringement claim: (1) distinctiveness; (2) nonfunctionality; and (3) likelihood of confusion.  Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998).  Under the first two elements of trade dress, distinctiveness and functionality, a product's aspects must be evaluated together as a whole.  Id. at 1050.  There is no requirement that the individual features themselves be distinctive or functional.  Id.

The analysis will first review the threshold issue of the application of trade dress law to Plaintiffs' claims.  The analysis will then address the three elements of trade dress: distinctiveness, functionality, and likelihood of confusion. Plaintiffs are unlikely to succeed on the elements of distinctiveness and functionality.  It is, therefore, not necessary to reach the issue of likelihood of confusion.

**Does Trade Dress Law Apply to Plaintiffs' Claims?**

Does trade dress law provide protection for the subject matter of the Plaintiffs' claimed trade dress?  Are the features of Plaintiffs' sales events purely a concept or marketing approach, or are they the specific embodiment of a concept?  The sales events may be characterized as trade dress if they are sufficiently concrete embodiments of a concept.  Imitation would

24

be actionable if Plaintiffs' trade dress meets the elements of functionality, distinctiveness, and the imitation creates a likelihood of confusion.

### 1. Various Courts' Treatment of Marketing Concepts As Trade Dress

If a marketing idea is a sufficient, specific embodiment of an idea, then it is protectable as trade dress.

Courts have struggled with the issue of when a marketing idea is protectable as trade dress. A marketing idea by itself is not trade dress, but it may become trade dress when it is the specific embodiment of the idea. 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 8.6 (4th Ed. 2004). As the District of Hawaii has recognized, "[d]rawing the line between 'ideas' or 'concepts' on the one hand and 'concrete expressions' on the other may sometimes present close questions." Big Island Candies, Inc. v. Cookie Corner, 269 F. Supp. 2d 1236, 1243 (D. Haw. 2003) (citation omitted).

The Ninth Circuit Court of Appeals has addressed the issue of what aspects of a marketing scheme trade dress can protect. In Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 841 (9th Cir. 1987), the court categorized the dispute as one that "expands the boundaries of trade dress infringement, seeking protection for a combination of elements employed in the marketing of restaurant services." The plaintiffs in Fuddruckers sought protection for both visual items of restaurant decor, the

25

menu, and features of the style of service such as a ceiling
music system that called customers when their orders were ready.
Id. at 840.  The court in Fuddruckers held that "a restaurant's
decor, menu, layout and style of service may acquire the source-
distinguishing aspects of protectable trade dress."  Id. at 841.
The appellate court then remanded for a new trial on the issues
of the protectability of the trade dress when evaluated for
functionality, secondary meaning, and likelihood of confusion.
Id. at 842.  HWE, Inc. v. JB Research, Inc., 993 F.2d 694, 695-97
(9th Cir. 1993) is also instructive for its evaluation of
specific embodiments of marketing and advertising techniques as
trade dress.  The court found the trade dress of the plaintiff's
design and marketing of a massage table to be, as a whole,
functional, and therefore not protected.

In Prufrock Ltd., Inc., 781 F.2d at 132, upon which
Defendants rely, the court determined that trade dress could not
protect a restaurant's general country-theme marketing idea.  The
Court held that the restaurant could argue trade dress protection
for some specific aspects of the restaurant's appointments and
decor that embodied a country theme.  The protection would apply
if the aspects of the theme met the other requirements for
protected trade dress.  "Dixie Management's imitation of
Prufrock's trade dress may be actionable if the trade dress is
nonfunctional."  Id. at 133.  The court went on to hold, however,

that the plaintiff could not succeed in protecting its trade
dress because the testimony presented described a functional
trade dress.  Id. at 134.

   In Duncan McIntosh Co. Inc. v. Newport Dunes Marina LLC, the
plaintiffs had organized a boat show at the same marina every
spring for over ten years.  324 F. Supp. 2d 1078, 1081-82 (C.D.
Cal. 2004).  The plaintiff sued the defendant for trade dress
infringement when the defendant sponsored a boat show in the
spring at the same marina.  The court held that the idea of a
boat show in the spring at a specific marina is a concept not
protectable under trade dress law.  Id. At 1084-85.  Trade dress
law could protect specific features of the boat show itself.
Features including "in the water exhibition" of boats and "big
boats" could be protected if those features were not functional.
Id. at 1084.  (holding that those aspects were not protected
because they were functional).  See also Hoopla Sports and
Entertainment, Inc. v. Nike, Inc., 947 F. Supp. 347, 352-53 (N.D.
Ill. 1996) (trademark and copyright law did not cover the idea
for an all-star boy's high school basketball game but it could
potentially protect the fixed, tangible incarnations of the
game).

   One court has acknowledged the possibility of protecting the
trade dress of a person similar to Plaintiffs' claim of trade
dress protection of the "Madman Dan" persona.  In World Wrestling

27

Fed'n Entm't, Inc. v. Big Dog Holdings, Inc., 280 F. Supp. 2d
413, 419-20 (W.D. Pa. 2003), plaintiff, the World Wrestling
Federation Entertainment, Inc., sought to protect the trade dress
of two famous wrestling personas; "The Rock" and "Stone Cold
Steve Austin."  The parties did not dispute that the World
Wrestling Federation Entertainment, Inc. ("WWE") had valid
protectable rights to the trade dress.  Id. at 430.  The court
denied protection to the WWE because the trade dress of
defendant's characters were a parody of the WWE's characters and
unlikely to cause confusion.  Id. at 436.

      Courts in other circuits have supported the distinction
between lack of protection as trade dress for a marketing idea
and granting protection to the specific embodiment of a marketing
idea.[2]

_____

      [2] In Home Builders Ass'n of Greater St. Louis v. L & L
Exhibition Mgmt., Inc., 226 F.3d 944, 948 (8th Cir. 2000) the
court held that trade dress law did not cover aspects of a home
builders show such as being held at a certain convention center
at specific dates every year.  Trade dress could protect tangible
aspects of the show such as the shape and style of exhibitor
booths.  See Abercrombie & Fitch Stores, Inc. v. Am. Eagle
Outfitters, Inc., 280 F.3d 619, 633-34 (6th Cir. 2002)(district
court erred in treating Abercrombie's trade dress claim as an
attempt to protect an overall marketing theme.  Abercrombie
sought protection for specific aspects of its theme such as
catalog design, store set-up, and the design of the goods
themselves.)  Haagen-Dazs, Inc. v. Frusen Gladje, Ltd., 493 F.
Supp. 73, 75 (S.D.N.Y. 1980) (holding that the idea of a
"Scandinavian marketing theme" for ice cream could not be
protected trade dress, but evaluating under trade dress the
specific embodiment of the theme such as the containers and
packaging); Sports Traveler, 25 F. Supp. 2d at 163.  But cf. CMM
Cable Rep., Inc. v. Ocean Coast Prop., Inc., 888 F. Supp. 192,

Plaintiffs' marketing concept for selling automobiles will only be eligible for trade dress protection if Plaintiffs can show it is a sufficient embodiment of an idea in specific, tangible features.

## 2. Plaintiffs' Marketing Concept

Plaintiffs here do not seek to protect only the idea of their "Slash-It" sales events, but also the specific aspects of their sales events. The specific physical aspects--a "madman" slasher, cars configured in a parking lot with prices on the window, the horn-honking and price-slashing procedures-resemble the specific aspects of the boat show in <u>Duncan</u> which were protectable as trade dress. <u>Duncan McIntosh Co. Inc.</u>, 324 F. Supp. 2d at 1084-85. The general concept of selling cars at prices discounted on the spot is insufficient to secure trade dress protection. Plaintiffs must demonstrate that their marketing idea is embodied in tangible aspects and that the aspects are protectable under trade dress law.

The practice of calling a customer's name on a loudspeaker when his food is ready was not protectable in <u>Fuddruckers, Inc.</u>. The court, however, reviewed the practice for distinctiveness and

---

202 (D. Me. 1995). The case dealt with radio promoters who licensed an idea for a radio contest to certain radio stations. The court held that trade dress did not cover the concept for the contest (including the rules and procedures). <u>Id</u>. The only aspects trade dress potentially protected were tangible features such as the brochure advertising the contest. <u>Id</u>.

non-functionality and found that it failed.  See <u>Fuddruckers,</u>
<u>Inc.</u>, 826 F.2d at 840-42.  The Court must analyze Plaintiff's
trade dress for distinctiveness and non-functionality even if
certain aspects of the trade dress are unlikely to warrant
protection.

**The Three-Part Test for Trade Dress Infringement**

The three requirements for trade dress protection are (1)
distinctiveness, (2) non-functionality, and (3) likelihood of
confusion between Plaintiffs' trade dress and Defendants' trade
dress.

**1.    Distinctiveness**

A business's trade dress is only protected if it is
distinctive.  <u>Wal-Mart Stores, Inc. v. Samara Brothers, Inc.</u>, 529
U.S. 205, 210 (2000).  Plaintiffs have not shown a likelihood
that they will succeed on the distinctiveness requirement.

Trade dress is distinctive if it is either (1) inherently
distinctive or (2) has acquired distinctiveness through secondary
meaning.  <u>Two Pesos, Inc.</u>, 505 U.S. at 769; <u>Morton v. Rank</u>
<u>America, Inc.</u>, 812 F. Supp. 1062, 1068 (C.D. Cal. 1993).[3]  A

_____

[3] A trade dress is inherently distinctive when it is capable
of identifying a product as originating from a particular source.
<u>Two Pesos, Inc.</u>, 505 U.S. at 773.  A trade dress has acquired
secondary meaning when consumers actually associate the product
with a particular source.  <u>Clicks Billiards, Inc. v. Sixshooters,</u>
<u>Inc.</u>, 251 F.3d 1252, 1262-63 (9th Cir. 2001).  Ordinarily a party
can meet the distinctiveness requirement through either a showing
of inherent distinctiveness OR secondary meaning.  The Supreme

showing of inherent distinctiveness suffices to meet the

distinctiveness requirement in the present case.  1 J. Thomas

McCarthy, McCarthy on Trademarks and Unfair Competition, § 8.13

(4th Ed. 2004) (citing Wal-Mart, 529 U.S. at 215).  If Plaintiffs

cannot show inherent distinctiveness, they can meet the

distinctiveness requirement if they show secondary meaning.

### a.    Inherent Distinctiveness

Trade dress is inherently distinctive when it is capable of

identifying products or services as coming from a specific

source.  Two Pesos, Inc., 505 U.S. at 773.  The aspects of the

claimed trade dress must be reviewed as a whole as the features

might be distinctive in totality, but not distinctive when viewed

individually.  Kendall-Jackson Winery Ltd., 150 F.3d at 1050-51.

In Miracle Blade, LLC v. Ebrands Commerce Group, LLC, 207 F.

Supp. 2d 1136, 1142 (D. Nev. 2002), the plaintiff spent millions

of dollars marketing their knives through television

infomercials.  The knives were offered in multi-piece sets with

---

Court limited this ability for certain trade dress claims in Wal-
mart.  Wal-Mart concerned claims of trade dress protection as
applied to children's clothing.  529 U.S. at 207.  The Court
determined that the plaintiff sought to protect design aspects of
the clothing.  The Court held that only a showing of secondary
meaning would suffice to protect design aspects of a product as
trade dress, particularly design features that have been or could
be patented.  Id. at 214-15.  If trade dress protection for
design aspects is sought, only secondary meaning will suffice and
a showing of inherent distinctiveness is not sufficient.  The
present case does not involve the design aspect of a product, and
Plaintiff, therefore, can show distinctiveness by showing either
inherent distinctiveness or secondary meaning.

certain promotional items.  *Id*.  Plaintiff sued the defendant
when defendant began marketing knives in similar sets through
similarly scripted televison infomercials.  The court denied
plaintiff's motion for a preliminary injunction, holding that
plaintiff's trade dress was not inherently distinctive.  *Id*. at
1153.  The trade dress was a "combination and refinement of
commonly used elements of other prior direct-marketed knife
sets."  *Id*.

     To succeed here Plaintiffs must show that their trade dress
is distinctive enough to identify Plaintiffs as the source of the
slasher sales service.  Plaintiffs are not likely to be able to
to show distinctiveness.  Most aspects of Plaintiffs' trade
dress, even when taken as a whole, are not distinctive.  Evidence
was presented at the preliminary injunction hearing of car
dealerships both in Hawaii and on the Mainland holding large
sales events appearing to include aspects similar to Plaintiffs'
sales.  The other sales were on weekends, with tents, food,
music, salesmen with clipboards, and the price written on the
cars' windshields.  These aspects taken together cut against
Plaintiffs' claim of having a special trade dress.  "Madman Dan"
can be argued to be distinctive when he performs his slasher
activities while customers sit behind the wheel of the cars they
wish to purchase and his "madman" price-slasher persona "slashes"
the price of the car.  Are Plaintiffs able to demonstrate that

32

their particular practices are distinctive enough to differentiate their sales events from those of other car dealerships?

Defendants have presented evidence that a third car dealership, Pflueger Honda, has for many years conducted similar sales events in Hawaii. The dealership advertised cars for very low prices beforehand and at the sales told customers to honk the horn of the car they wished to purchase. (Wolshin Decl. ¶¶ 5, 8; Nascimento Test. 10/13/04) This evidence undermines Plaintiffs' argument that their trade dress is distinctive in Hawaii. At the preliminary injunction hearing, Defendants also presented video evidence of slasher sales on the Mainland with a trade dress similar to that before the Court.

Plaintiffs' position is similar to that of the plaintiff in <u>Miracle Blade, LLC</u>. As in <u>Miracle Blade, LLC</u>, Plaintiffs have not shown their trade dress to be distinctive. It can be likened to a combination and refinement of the commonly used practices of other car dealers. <u>Miracle Blade, LLC</u>, 207 F. Supp. 2d at 1153. Plaintiffs have not met their burden of showing that they are likely to succeed in establishing that their trade dress is inherently distinctive.

**b.    Secondary Meaning**

Plaintiffs could still succeed with their motion for an injunction if they could show their trade dress has acquired

secondary meaning.  Two Pesos, Inc., 505 U.S. at 769.  Unlike
inherent distinctiveness, a secondary meaning analysis asks not
if the trade dress makes it *possible* to identify the source of
the goods, but whether consumers *actually* identify the source of
the goods or service based on the trade dress.  Clicks Billiards,
Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1262-63 (9th Cir.
2001).  Although evidence of sales, advertising, and promotion of
the trade dress may be relevant in determining whether a product
or service has acquired secondary meaning, it is not dispositive.
First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th
Cir. 1987) (holding that millions spent advertising a product
image over five years did not establish secondary meaning).

The totality of the aspects of Plaintiffs' trade dress are
unlikely to result in consumers identifying Plaintiffs as their
source.  Plaintiffs have presented no significant evidence that
consumers actually identify inexpensive food, music, tents,
weekend sales events, salesmen with clipboards, etc. with them.
The only aspects of the trade dress that may have possibly
acquired secondary meaning are the horn-honking and on-the-spot
price-slashing by the unusual price-slashing persona of Madman
Dan.  Plaintiffs have provided only limited anecdotal examples of
actual consumer association of these aspects of trade dress with
their sales events.  (Rollison 9/14/04 Decl. ¶ 12; Stanford
Testimony 10/13/04)  Defendants have provided evidence to rebut

34

Plaintiffs' evidence by showing Pflueger Honda has also conducted similar sales events over the years in Hawaii. Plaintiffs' only other evidence in support of secondary meaning is the expenditure of over $5 million on advertising their "Slash-It" sales and the accompanying trade dress in Hawaii in the last five years. (Stanford Decl. 9/14/04 ¶ 3) Plaintiffs' advertising budget alone does not fulfill their burden to show a likelihood of success on the issue of their trade dress having a secondary meaning. First Brands Corp., 809 F.2d at 1383. Plaintiffs have not shown a likelihood of success in proving that their trade dress is distinctive, through the acquisition of secondary meaning.

## 2.    Functionality

The trade dress statute, 15 U.S.C. §1125(a), places the burden on the plaintiff to prove the non-functionality of the alleged trade dress features. A feature is functional when it is essential to the use or purpose of the product or if it affects the product's cost or quality. TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 33 (2001). A product feature may be functional if it has "some utilitarian advantage." Disc. Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1007 (9th Cir. 1998). Features of a trade dress that are functional separately might be protected as not merely functional when taken together as a whole. Clicks Billiards, Inc., 252 F.3d

at 1259.  Functionality of trade dress is a question of fact.

HWE, Inc., 993 F.2d at 696.

Plaintiffs have not shown they are likely to prove the
features of their sales events are non-functional.  Having a
customer honk the horn of the car he wishes to purchase may not
be necessary for selling a car, but it is essential for a
customer to somehow show the dealer which car he wishes to
purchase.  It is not necessary to have a "madman price-slasher"
cross out the price to sell a car, but bargaining to determine
the lowest price is commonplace in every car transaction.  The
aspects of the Plaintiffs' sales events, when taken together,
give them a utilitarian advantage in marketing and quickly
selling large inventories of cars.  Plaintiff Daniel Ryan's
declaration of September 17, 2004 demonstrates his sales events
serve the function of allowing dealerships to clear inventory
quickly.  (Ryan Decl. ¶ 8)  Plaintiffs have not shown a
likelihood of success on the non-functionality element.

**3.    Likelihood of Confusion**

Having determined that Plaintiffs are unlikely to succeed in
showing distinctiveness or non-functionality, the Court need not
reach the issue of likelihood of confusion.

**Balance of Hardships**

Plaintiffs have not made a strong showing that they are
likely to succeed on their trade dress claims.  Although their

36

business may suffer if Defendants continue their alleged infringement, Plaintiffs have not shown a danger of insolvency or other irreparable harm.  On balance, the preliminary injunction must be denied with respect to the trade dress claim.

## IV.   STATE LAW CLAIMS

Plaintiffs also bring trademark and trade dress claims under Hawaii state law.  They bring their claims both under common law and Hawaii Rev. Stat. §§ 480-2, 481A-3, and 482-32.

### A.    Trademark Infringement

The Hawaii Deceptive Trade Practices Act has been found to protect against trademark infringement.[4]  Carrington v. Sears, Roebuck & Co., 5 Haw. App. 194, 198 (1984).  The statute follows the "likelihood of confusion" test to determine infringement.  Id. at 198-99.  Hawaii law also provides for remedies against anyone who uses a trademark without the consent of a "registrant."  Haw. Rev. Stat. § 482-31.  Hawaii law could give possible protection to Wolshin as a Hawaii registrant just as

---

[4] Haw. Rev. Stat. § 481A-3(a) provides "(a) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person:
. . .
(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;"

federal law gives federal registrants a presumption of
protection.  But there are questions arising from expired
registration, Plaintiffs' prior use of the mark, and Wolshin's
possible abandonment of the mark.  In addition, any potential
rights Defendants might have against Plaintiffs under state law,
due to registration of the "slasher sale" trademark in Hawaii,
may be preempted by Plaintiffs' rights under the Lanham Act
through federal registration.  <u>Hoots</u>, 403 F.2d at 907
(conflicting state law cannot defeat policy of federal law to
protect registered trademarks).

### B.    Trade Dress

To give Plaintiffs relief for trade dress infringement under
Hawaii common law or the Uniform Deceptive Trade Practices Act,
Haw. Rev. Stat. § 481A-3, would require the Court to find that
Hawaii law protects trade dress to a greater extent than federal
law.  Plaintiffs have presented no Hawaii case supporting this
notion.  The Plaintiffs have not shown a likelihood of success on
their federal trade dress claim.

### C.    Trademark Dilution

Plaintiffs bring a state law claim for trademark dilution
under Haw. Rev. Stat. § 482-32.  Plaintiffs have presented
insufficient evidence to show a likelihood of success on the
state trademark dilution claim.

**CONCLUSION**

The court HEREBY ORDERS that:

(1) Plaintiffs' Motion for Preliminary Injunction is GRANTED IN PART and DENIED IN PART;

(2) Defendants are ENJOINED from using the mark "Slasher" or "Slash-It" in their advertisements or sales events.

(3) Plaintiffs' Motion for a Preliminary Injunction with respect to trade dress, trademark dilution, and state law claims is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, November 30, 2004.


HELEN GILLMOR
United States District Judge



**Civil No. 04-00561 HG-KSC, Daniel P. Ryan, et. at. v. Tony Hawaii Automotive Group, Ltd. et. al., ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**